UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------x
ROCKY POINT HPFS INC., aka,
ROCKY POINT HPFS INC., a New York
Corporation; NICHOLAS GLENN
SPRINGMAN, an individual; and
STEPHEN DELUCA, an individual,

                    Plaintiffs,          MEMORANDUM & ORDER
                                         No. 19-CV-1308(JS)(JMW)

     -against-


UNITED STATES OF AMERICA,

                    Defendant.
---------------------------------x
Appearances:

For Plaintiffs:     Andrew Z. Tapp, Esq.
                    Metropolitan Law Group, PLLC
                    1971 West Lumsden Road, No. 326
                    Brandon, Florida  33511-8820

For Defendant:      Mary M. Dickman, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    610 Federal Plaza, 5th Floor
                    Central Islip, New York  11722


SEYBERT, District Judge:

          By this action, Plaintiffs Rocky Point HPFS Inc. (aka,

Rocky Point HPFS Inc., a New York Corporation) ("Rocky Point" or

the "Store"), Nicholas Glenn Springman ("Springman"), and Stephen

DeLuca ("DeLuca"; together with Springman and Rocky Point, the

"Plaintiffs"), seek judicial review of the current decision of the

U.S.  Department  of  Agriculture  ("USDA"  or  "the  Agency")

permanently disqualifying Plaintiffs from participating as a SNAP[1]
vendor.  (See Compl., ECF No. 1, ¶¶ 1-9.)  Presently before the
Court is the summary judgment motion (hereafter, "Motion") (see
ECF No. 33; see also Support Memo, ECF No. 33-2; Reply, ECF No.
40) of Defendant United States of America ("Defendant" or "United
States") requesting the Court affirm the USDA's determination that
Rocky Point be permanently disqualified as an authorized retail
SNAP vendor.  Plaintiffs oppose the Motion.  (See Opp'n, ECF No.
35.)  For the reasons that follow, the Motion is GRANTED.


                [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

---

[1] "SNAP" is an acronym for the "Supplemental Nutrition Assistance
Program" -- formerly known as Food Stamps -- which is overseen by
the Food & Nutrition Service ("FNS") of the USDA.  (See Compl.,
ECF No. 1, ¶ 2; see also Support Memo, ECF No. 33-2, at 2 n.2.)
Herein, the Court may also refer to SNAP as "the Program".

BACKGROUND

I.  Relevant Factual Background[2]

        The majority of the underlying facts leading to this action are not in dispute.  Rather, as more fully discussed, below, the core disputed fact is whether the Store engaged in "trafficking" in violation of SNAP regulations on May 16, 2018, and whether there is sufficient evidence establishing that said trafficking occurred, which trafficking is the basis for disqualifying Plaintiffs from SNAP participation.  (See, e.g., Investigator Dep. Tr., ECF No. 36-1 (sealed), 49:18-24; compare 56.1 Stmt. ¶ 10 (stating, on three occasions, the Store permitted USDA "investigator to purchase ineligible non-food items with SNAP

---

[2]  Unless otherwise stated, the factual background is derived from the parties' Local Civil Rule 56.1 Statements.  Defendant's Rule 56.1 Statement (see ECF No. 33-1) shall be cited as "56.1 Stmt." Plaintiffs' Reponse to Defendant's Rule 56.1 Statement (see ECF No. 35-7) shall be cited as "56.1 Resp."  Said Response also includes Plaintiffs' "Additional Facts", which shall be cited as "Pl. Add'l Facts".  Defendant's reply to Plaintiffs' Additional Facts (see ECF No. 40-2) shall be cited as "56.1 Reply."

    Herein, internal quotation marks and citations in the 56.1 Statement, Response, and Reply have been omitted.  A standalone citation to the Rule 56.1 Statement, Response or Reply denotes the Court has determined the underlying factual allegation is undisputed.  Further, citation to a party's Rule 56.1 Statement, Response or Reply incorporates by reference the party's citation(s), if any.  However, in its discretion, the Court may cite directly to the underlying exhibit(s).

    The underlying Administrative Record (see ECF No. 41) shall be cited as "A.R. [Bates Number]."  Plaintiffs' exhibits are identified by letters (see ECF Nos. 35-1 through 35-6) and are attached to Plaintiffs' Opposition.

benefits"), with 56.1 Resp. ¶ 10 (admitting statement and asserting applicable sanction for such violations is "a 6-month disqualification under 7 C.F.R. §278.6(e)").)

Rocky Point is an authorized SNAP vendor (or firm) owned by Springman and DeLuca (hereafter, the "Owners"). As such, SNAP beneficiaries may purchase eligible food items with their EBT cards[3] from the Store. Further, because Plaintiffs participate in the Program, they accept the responsibility of preventing

---

[3]

> EBT cards operate like debit cards. 'When a SNAP recipient wants to purchase food, retailers swipe the beneficiary's EBT card through an EBT terminal and the recipient enters a personal identification number on a keypad. Alternatively, a recipient's EBT account information can be entered manually. The purchase amount is deducted from the recipient's EBT account and credited to the retailer's bank account. The system is entirely cashless.

Bros. Grocery & Deli Corp. v. United States, No. 20-CV-6961, 2021 WL 4443723, at *1 (S.D.N.Y. Sept. 28, 2021) (citations omitted); see also SS Grocery, Inc. v. U.S. Dep't of Agric., 340 F. Supp. 2d 172, 176 (E.D.N.Y. 2018) ("Through SNAP, eligible low-income house-holds receive electronic benefit transfer ("EBT") cards that facilitate the purchase of food." (citing 7 U.S.C.A. § 2016(a)-(b)); Arias v. United States, No. 13-CV-8542, 2014 WL 5004409, at *1 (S.D.N.Y. Sept. 29, 2014) ("FNS, as part of the USDA, administers SNAP through which qualifying households receive benefits via electronic benefit transfer ('EBT') cards, similar to debit cards. Each month the [EBT] card is credited with food stamp benefits that can then be used at authorized [vendors]. The [vendor] swipes the [EBT] card and the SNAP beneficiary enters a [PIN]. The amount of each purchase is deducted from the SNAP account and is electronically credited to the [vendor]'s bank account". (citations omitted)).

violations of SNAP regulations, including those committed by Store employees.  Violations occur when vendors sell ineligible items to SNAP beneficiaries or trade cash for SNAP benefits, i.e., trafficking.  To ensure and monitor compliance of SNAP vendors, the USDA conducts investigations of those vendors.

The Store was subject to a USDA investigation from February 20, 2018 through June 28, 2018, which included six visits by an USDA investigator (hereafter, the "Investigator").  During three visits, the Investigator purchased ineligible items with his EBT card, which violated SNAP regulations.  Plaintiffs do not dispute the violations, but contend such violations would subject them only to a six-month disqualification from the Program.  (See 56.1 Resp. ¶ 10.)

Then during a May 16, 2018 Store visit, the Investigator bought $13.45-worth of SNAP-eligible food items.  Defendant contends that when the Investigator made his $13.45 purchase, he also requested the clerk subtract $20 from the balance of his EBT card and give him back $20 in cash, but the clerk declined to make the exchange after a second clerk, a female (hereafter, the "Second Clerk"), instructed that the Store did not provide cash back on EBT cards and stated there was an ATM available in the Store for use.  (See, e.g., Investigator Dep. Tr. 50.)  But, thereafter, Second Clerk called the Investigator over to another register, stating, "I am going to do this for you but don't say anything to

the owner.  I know a couple of tricks."  Second Clerk proceeded to
subtract $20 from the Investigator's EBT card balance and then
give him a $20-bill (hereafter, the "Disputed Incident").  (See
May 16, 2028 Receipts, Ex. 1, ECF No. 40-1 at 4, attached to
Dickman Decl., ECF No. 40-1 at 1-2.)  Plaintiffs dispute
trafficking occurred during the Disputed Incident on the basis
that "[t]he Investigator's description of [Second C]lerk matches
only one employee, Ms. Kaastra, who was not present at the time of
the transaction" and that "Defendant has no documentation to show
. . . the cash trafficked was ever actually present."  (56.1 Resp.
¶ 8 (further stating "[n]o such transmittal document exists" and
"[n]o photographs or other corroborating evidence exists").)
Plaintiffs also maintain, "the Investigator subsequently changed
his description of Clerk #2 to be a male."  (Id. at ¶ 9 (citing
Investigator Dep. Tr. 51:6-22, and stating "[n]o errata sheet or
correction [to the Investigator's deposition testimony] was ever
made").)  Indeed, when asked about his investigation report
regarding the Disputed Incident and, in particular, to identify
Clerk Two, the Investigator testified he recalled Clerk Two "was
a white male in his 20's, taller than five[-]five and approximately
anywhere from 150 to 170 [pounds]."  (Investigator Dep. Tr. 51:8-
11; but compare, Investigation Report, Ex. E, A.R. 52-53
(describing clerk as: a blond female; approximately 45 to 50 years
old; approximately 5'5" to 5'8" tall; and approximately 135 to 145

pounds).)   The Investigator further explained that in instances involving multiple clerks, since there is only one line provided to describe a clerk, an investigator is able to put additional clerks' descriptions in the narrative section of the report, but he forgot to do so regarding the Disputed Incident.   (See id. 51:18-22.)

In additional testimony about the Disputed Incident, the Investigator explained, notwithstanding that eligible and ineligible purchased items are photographed when a vendor (or firm) is being investigated and that, in one instance, the Investigator photographed cash he received in a prior, unrelated trafficking incident, he does not take photographs of the cash he receives from fulfilled trafficking requests because it is not Agency policy to do so; not photographing cash received in trafficking incidents has been his practice for more than six-and-one-half years of conducting USDA investigations. (Investigator Dep. Tr. 56.)   Thus, the Investigator did not take a photograph of the $20-bill he received during the Disputed Incident; instead, he recorded the bill's serial number in his Investigation Report.   (Id. 53; 56; see also Ex. E at A.R. 69 (identifying "TRAFFICKING CASH DATA" as "MA11870672C SERIES 2013" (bold font removed)).)

After his May 16, 2018 investigative visit, the Investigator made a June 28, 2018 visit to the Store.  He presented eligible items and his EBT card to a Store clerk, at which time he

also requested $20 cash back; the clerk declined the Investigator's cash request, informing the Investigator, "We don't do that."

By a July 10, 2018 charging letter (hereafter, the "Charging Letter"), FNS notified Plaintiffs they were charged with trafficking and accepting SNAP benefits in exchange for ineligible items. A redacted copy of the Investigator's report of his six visits to the Store was included. Among other things, the Charging Letter explained: sanction for trafficking was permanent disqualification from the Program, but under certain circumstances, the FNS may impose a civil money penalty ("CMP") in lieu of permanent disqualification; and, if Plaintiffs wished to request a CMP in lieu of permanent disqualification, they had ten calendar days from receipt of the Charging Letter to provide proof they met the four criteria delineated in regulation Section 278.6(i) regarding eligibility for same (hereafter, the "Four Criteria"). The Charging Letter was received by Plaintiffs on July 11, 2018.

Proceeding pro se, Plaintiffs timely responded to the Charging Letter (hereafter, the "Pro Se Response").[4] Said Response

_____

[4] While undated, it is undisputed Plaintiffs' Pro Se Response was postmarked July 20, 2018. (See 56.1 Stmt. ¶ 20.) According to the Charging Letter, to request a CMP, such "request and all documentation must be postmarked by midnight of the 10th calendar day after you receive this letter, in order to be considered timely." (A.R. 56.) Because the Charging Letter was received on July 11, 2018, Plaintiffs' subsequent July 20, 2018 posting of their Pro Se Response was timely; it is irrelevant that the FNS

consisted of a four-page memo addressing the CMP Four Criteria eligibility requirements, together with six pages of exhibits. (See A.R. 74-84.)  Plaintiffs "did not refute the allegations of trafficking" (56.1 Stmt. ¶ 27); according to Plaintiffs, however, "[a] lack of specific refutation was not an acknowledgement of the veracity of the allegations."  (56.1 Resp. ¶ 27 (further responding: "[t]he document speaks for itself"; "Plaintiffs were unaware of how to respond to the . . . Charging Letter, and believed that they were being audited regarding their policies"; and "Plaintiffs had inadequate time to investigate the allegations").)

As to Criterion One (i.e., that a firm has an effective compliance policy in place, see 7 C.F.R. § 278.6(i)(1)): Plaintiffs identified six policy changes it would implement "in conjunction with current" policies, which involved "perform[ing] SNAP benefit compliance checks seven days a week thru the checking of EBT transaction receipts."  (Pro Se Response, A.R. 74.)  Among other things, after performing a daily review of the EBT receipts: a cashier found trafficking will be terminated; the first time a cashier is found permitting the sale of an ineligible item, a

---

received said Response on July 24, 2024.  (See id.)  Therefore, the Court rejects the Department's untimeliness contention.  In any event, notwithstanding the RIB Case Analysis found Plaintiffs did not timely request imposition of a CMP in lieu of disqualification, because the FNS proceeded to evaluate Plaintiffs' request for said CMP, the dispute on this issue is deemed immaterial.  (Cf. 56.1 Resp. ¶ 39.)

warning will be issued notifying the cashier that a subsequent infraction will result in termination; if a cashier is found permitting the sale of a ineligible item a second time, termination of employment will follow; if trafficking occurs or an ineligible-item sale occurs, all employees will receive SNAP-compliance re-training. (See id. at A.R. 74-75; see also A.R. 78, Pro Se Response Exs. A-C (examples of receipts and reports to be run in aid of identifying noncompliant behavior).)

    As to Criterion Two (i.e., a firm's compliance policy was in effect prior to any alleged violation(s)): Stating a current policy was in place, Plaintiffs elaborated that employees are required to review "the SNAP training for retailers guide [(hereafter, the "Guide")] and the training video [(hereafter, the "Video")]" and, once reviewed, execute a "sign off sheet" indicating they have completed reviewing the Guide and Video (hereafter, the "Sign-Off Sheets"). (See id. at A.R. 74.) Plaintiffs attached a sample Sign-Off Sheet, entitled "SNAP TRAINING PROGRAM". (See Pro Se Response Ex. D, A.R. 79.)

    As to Criterion Three (i.e., the firm had developed and instituted an effective, compliant training program, with documentation to prove same, see § 278.6(i)(2)): Plaintiffs explained they would be expanding their "current policy that have been put in place immediately since learning of our opportunities surrounding the SNAP program." (Pro Se Response at A.R. 75.)

First, in addition to new employees reviewing the Guide and Video, they will be taken on an aisle-by-aisle store tour to show them the items that are ineligible under SNAP.  (See id.)  Second, on a quarterly basis, all employees will receive retraining; thereafter, employees will be required to sign an updated Sign-Off Sheet.  (See id.)  Third, for all new employees and after quarterly employee retraining, a written exam will be administered testing employees' knowledge of eligible and ineligible SNAP items.  (See id. (citing Pro Se Response Ex. F (sample test)).)  For employees who do not answer all questions correctly, the results will be reviewed with management or the Owners and, if determined necessary, re-testing may be implemented.  (See id. at A.R. 75-76.)

As to Criterion Four (i.e., the firm's unawareness of, disapproval of, lack of benefit from or involvement in non-compliant conduct or trafficking violation):  Regarding the sale of ineligible items, the Owners state (1) they were unaware that the three transactions involving ineligible items occurred, and (2) given the existing and new SNAP policies Plaintiffs implemented, they were confident they would be found SNAP-compliant.  (See id. at A.R. 76.)  Regarding the Disputed Incident, the Owners stated:

> Information stated by the [I]nspector . . .
> states that Clerk #1 (which we have identified
> as an individual employed in the capacity of

> cashier) and Clerk #2 (which we have
> identified as an individual employed in the
> capacity of management), during the initial
> purchase, BOTH denied the request for the
> twenty dollar cash back. . . .  Then Clerk #2,
> on her own volition, invite[d] the [Inspector]
> back to her register and state[d], "I am going
> to do this for you but don't say anything to
> the [O]wner.  I know a couple tricks."  [We]
> cannot explain her decision to perform this
> cash transaction as  . . . Clerk #2 has already
> been terminated for other misconduct . . . and
> is no longer accessible for questioning.
> [We], as [O]wners of the [S]tore, DID NOT know
> of the transaction[;] nor were we involved in
> her decision to perform this violation.
> Through our investigation of this violation we
> have created and implemented additional
> procedures to insure the integrity of the SNAP
> program stays in tact [sic] at our location.

(Id.)  Additionally, the Owners explained their current policy was
that anyone caught trafficking was subject to immediate
termination.  (See id. at A.R. 76-77 (further expressing confidence
Store's existing and updated compliance program would result in
Store being found SNAP-compliant).)

Plaintiffs' Pro Se Response was reviewed by FNS'
Retailer Investigation Branch ("RIB") in a case analysis
(hereafter, the "RIB Case Analysis");[5] said Case Analysis

---

[5]    "FNS has an internal investigative unit, the Retailer
Investigations Branch (RIB), which conducts investigations to
monitor the activities of SNAP retailers.  The RIB can take
disqualification actions based on its investigations." USDA:
Analysis of FNS' Supplemental Nutrition Assistance Program Fraud
Prevention and Detection Efforts (Audit Report 27002-0011-13) 5
(Sept. 28, 2012),
https://usdaoig.oversight.gov/sites/default/files/reports/2022-
03/27002-0011-13.pdf; see also id. at n.12 ("FNS' retailer

summarized Plaintiffs' submissions, including supporting exhibits, and assessed same against the Investigator's reports. (See A.R. 84-86.)  The RIB Case Analysis found the Investigator's "report to be credible evidence that multiple transactions for the sale of ineligible non-food items and trafficking occurred at the [Store]", while the Pro Se Response "provided no explanation or evidence to refute the occurrence of the documented violations." (Id. at A.R. 85 (further stating, "[t]he evidence against the subject is very persuasive").)  Regarding the Owners' request for a trafficking CMP, the RIB Case Analysis recommended permanent disqualification.  (See id. at A.R. 84, 86.)  Relying upon the Section 278.6(i) Four Criteria, the RIB Case Analysis found: (1) as to Criterion One, Plaintiffs relied upon blank Sign-Off Sheets that merely mentioned SNAP's Guide and Video, which was not evidence of a written compliance policy (see id. at A.R. 85); (2) as to Criterion Two, Plaintiffs' evidence of blank Sign-Off Sheets and a sample test, which were neither signed nor dated, failed to "establish that a compliance policy and program were in operation prior to the occurrences of violations" (id. at A.R. 86); (3) as to Criterion Three, because the Owners did not submit

_____

compliance department, known as the RIB, uses ALERT information to investigate retailers.  RIB's nationwide staff conduct undercover investigations of SNAP approved retailers."); (A.R. at 113 ("RIB is responsible for conducting onsite investigations in [SNAP] authorized retail stores, ensuring the Program's integrity.")).

"a copy of the[ir] written curricula or any contemporaneous records of training sessions," a proper evaluation of Plaintiffs' training program could not be conducted; in other words, what had been submitted was "not sufficient to determine whether an effective personnel training program had been developed and instituted" (id.); and (4) as to Criterion Four, the Owners' representation they were unaware of the Disputed Incident trafficking was acceptable and, therefore, said Incident was considered "a first offense trafficking violation for [the Store]" (id.).

The RIB Case Analysis for the Store concluded Plaintiffs did not provide factual evidence to refute the non-compliant sales claims and the trafficking claim. Further, regarding the sale of ineligible items, while a firm with no previous violations for such sales is subject to a six-month disqualification, "[b]ased on the ALERT analysis above[,] the . . . [S]tore [wa]s not eligible for a hardship in lieu of term disqualification." (Id.) The RIB Case Analysis also determined Plaintiffs' were ineligible for a Trafficking CMP since the Owners failed to meet three of the Section 278.6(1) Four Criteria, which requires substantial evidence to prevail. (See id. at A.R. 85.) Hence, permanent disqualification was recommended. (See id. at A.R. 86.)

Clearly adopting RIB's findings and recommendation, by its August 7, 2028 letter, the FNS informed Plaintiffs the Store was permanently disqualified from SNAP (hereafter, the

"Disqualification Decision"). (<u>See</u> A.R. at 87-88.) Said Decision stated that, in considering Plaintiffs' eligibility for a Section 278.6(i) Trafficking CMP, "[w]e have determined . . . you are not eligible for the CMP because you failed to submit sufficient evidence to demonstrate . . . your firm had established and implemented an effective compliance policy and program to prevent violations of [SNAP]." (<u>Id.</u> at A.R. 87.) Plaintiffs were advised of their right to seek review of the Disqualification Decision. (<u>See</u> <u>id.</u>)

While Plaintiffs do not dispute the contents of the RIB Case Analysis, they "deny" they "were ever provided a copy of the document prior to" receipt of the Disqualification Decision.[6]

---

[6]   In pursuing administrative review of the Disqualification Decision, the RIB Case Analysis was provided to Plaintiffs' counsel as the result of a Freedom of Information Act ("FOIA") request. (<u>See</u> A.R. 112, 114.) According to FNS FOIA Officer J. Weatherly, the RIB Case Analysis was withheld in part pursuant to FOIA Exemption 5, <u>see</u> 5 U.S.C. § 552(b)(5), the so-called deliberative process privilege, because it "is an intra-agency record created to examine the existence of fraud" and, as such, it is "pre-decisional and deliberative, i.e., a part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." (<u>Id.</u> at A.R. 114.) The Court finds the initial non-provision of the RIB Case Analysis not to be a disputed issue of material fact. (<u>See, e.g.,</u> 56.1 Resp. ¶ 78 (admitting RIB Case Analysis sets for the FNS's analysis of Plaintiffs' <u>Pro Se</u> Response, "though this document was not shared with the Plaintiffs until [Administrative] Review"); <u>see also, e.g.,</u> <u>Aetna Life Ins. Co. v. Big Y Foods, Inc.,</u> 52 F.4th 66, 72 (2d Cir. 2022) ("A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs 'if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'"

(56.1 Resp. ¶ 34.)   They also baldly dispute "whether sufficient evidence had been submitted."   (Id. ¶ 31.)   As to evidence supporting their meeting the Four Criteria: (1) <u>regarding Criteria One</u>, Plaintiffs content they noted policies that "were already in existence" (<u>id.</u> ¶ 35 (citing <u>Pro Se</u> Response at A.R. 75)), as well as baldly dispute FNS's Guide and Video "d[id] not contain store policies in-and-of themselves" (<u>id.</u>); (2) <u>regarding Criteria Two</u>, Plaintiffs state their proposed sample test is not a Section 278.6(i) requirement (<u>id.</u> ¶ 36); and (3) <u>regarding Criteria Three</u> and the finding that Plaintiffs failed to submit dated training curricula and contemporaneous records of training sessions, Plaintiffs assert they "were unaware that such documents needed to be submitted," but "subsequently submitted them on Administrative Review" (<u>id.</u> ¶ 37 (citing A.R. 133-174)).

On August 10, 2018, Plaintiffs retained counsel to represent them in defending against their SNAP disqualification (hereafter, "Counsel").   (See A.R. 91-93.)   Thereafter, on August 13, 2018 and through Counsel, Plaintiffs:  (1) requested review by the Administrative Review Division ("ARD") of the USDA's Disqualification Decision (see A.R. 94); and (2) in addition to the information already submitted to the USDA by the Owners, <u>pro se</u>, requested an extension "to submit a written argument and new

_____

(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

evidence for . . . consideration."[7]   (Id.)   Counsel was granted extensions "to submit additional information or evidence" in support of Plaintiffs' position.  (Letter from M. Viens, FNS Admin. Review Officer, to A. Tapp, Esq. (Aug. 28, 2018), A.R. 98.)

Subsequently, Counsel requested records from FNS pursuant to the Freedom of Information Act, which were provided; said records included two cash register receipts from May 16, 2018, i.e., a receipt for the Investigator's initial purchase of SNAP-eligible items (hereafter, the "Items Receipt") (see A.R. 117), and a receipt for the exchange of SNAP benefits for $20.00 cash, the so-called Disputed Incident (hereafter, the "Disputed Incident Receipt") (see A.R. 178).   (See 56.1 Stmt. ¶¶ 41.) Relying upon the Items and Disputed Incident Receipts, as well as other evidence, Plaintiffs timely submitted a "Brief in Support of Appellant's Request for Review of Permanent Disqualification" to the ARD (see A.R. 117-128), together with new exhibits (see A.R. 129-179).   Contending the ARD had the authority to consider new evidence (A.R. 121), Plaintiff's Counsel proceeded to challenge the evidence relied upon by the FNS, arguing: (1) other than the Investigator's affidavit, there is no corroborating evidence of trafficking (A.R. 121-22); (2) the only clerk matching the physical description of the clerk identified by the Investigator was not

---

[7]  In total, Counsel was granted three extension requests.  (See 56.1 Stmt. ¶ 43.)

working when the Disputed Incident occurred as shown by comparing the time stamped on the Disputed Incident Receipt with that clerk's time card and pay stub for the week when the Disputed Incident occurred (A.R. 123); (3) because there was neither a photograph of the $20-bill allegedly trafficked, nor a disposition report for the bill, there is no way to verify said bill existed (A.R. 123-24); and, relatedly, (4) the Investigator's affidavit was not reliable hearsay upon which the FNS could rely (A.R. 124-25). Thus, given the evidence before the FNS, Plaintiffs asserted the USDA's determination of trafficking was erroneous.  (A.R. 125.)

Alternatively and relying upon newly offered evidence, Plaintiffs requested that, if the ARD affirmed the FNS's trafficking finding, a CMP be issued in lieu of permanent disqualification.  (See id.)  They contended they satisfied the Four Criteria warranting the imposition of a CMP, which are:

> the retailer must (1) "have developed an effective compliance policy", (2) ["]established that both its compliance policy and program were in operation at the location where the violations(s) occurred prior to the occurrence of violations", (3) "had developed and instituted an effective personal training program", and (4) "firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations".

(A.R. 125 (quoting 7 C.F.R. § 278.6(i)).)

As to the First Criterion: Plaintiffs asserted that, prior to receiving the July 2018 Charging Letter, they operated the Store for more than two years without any SNAP violations or, even, so much as a warning letter; this evinced Plaintiffs' SNAP-compliance policies were effective. (See A.R. at 126.) So, too, was the Store clerk's June 28, 2018 refusal to engage in trafficking when the Investigator requested a trafficking transaction demonstrative of the effectiveness of Plaintiff's SNAP-compliance policies. (See id.)

As to the Second Criterion: Plaintiffs relied upon "SNAP Training Sign Off" sheets (i.e., the Sign-Off Sheets); they contended employees had to sign the Sign-Off Sheets before they began working in the Store. (A.R. at 126.) Further, as is evident from the Sign-Off Sheets, the training materials employees were required to review were the Guide and Video. (See id.) Moreover, since some of the Sign-Off Sheets are dated from 2016, they show Plaintiffs' SNAP-compliance policy was established prior to the RIB Investigation and Plaintiffs receiving the Charging Letter. (See id. at 126-27.)

As to the Third Criterion: Plaintiffs reiterated they had a training program in place prior to the RIB Investigation, which Plaintiffs voluntarily revised following the Charging Letters' notification of the SNAP violations. (See id. at 127.) Said revised training program was reflected in the submitted 2018

signed Sign-Off Sheets, which, in addition to identifying the Guide and Video as materials to be reviewed by employees, listed "[a] store tour identifying ineligible & eligible items with a manager". (See, e.g., A.R. 173-74; see also A.R. at 127.)  Plaintiffs further claimed, "The Store also added quarterly re-training of all Store employees on proper SNAP procedures."  (A.R. at 127.)

As to the Fourth Criterion:  Plaintiffs "continue[d] to deny that trafficking occurred at the Store" and emphatically denied having approved same, highlighting that in his report, the Investigator stated the clerk involved in the Disputed Incident told the Investigator not to "say anything to the owner".  (A.R. 127.)  Plaintiffs asserted the clerk's statement indicated she acted of her own volition and without the Owners' consent, knowledge or approval.  (See id.)

Upon review of Plaintiffs' newly submitted evidence and consideration of their arguments, the ARD determined "there [wa]s sufficient evidence to support a finding that a permanent disqualification from participation as an authorized retailer in [SNAP] was properly imposed against Rocky Point . . . by the Retailer Operations Division (Retailer Operations)."  (Final Agency Decision, ECF No. 41-2, at A.R. 189.)  The Administrative Review Officer (hereafter, the "A.R. Officer") explained:

> In an appeal of an adverse action, the Appellant bears the burden of proving by a preponderance of the evidence that the

> administrative actions should be reversed.
> That means the Appellant has the burden of
> providing relevant evidence which a reasonable
> mind, considering the record as a whole, would
> accept as sufficient to support a conclusion
> that the argument asserted is more likely to
> be true than not true.

(Id. at A.R. 190.) She also clarified that the ARD's review "is limited to the facts at the basis of Retailer Operations' determination at the time it was made." (Id. at A.R. 193 (emphasis added).) Highlighting Plaintiffs had been charged with violations for the sale of ineligible nonfood items and trafficking when a Store employee exchanged cash for SNAP benefits, the A.R. Officer explained, "[t]he sale of nonfood items carries a penalty of term disqualification which is subsumed under the permanent disqualification penalty for trafficking." (Id.) Thus, her analysis focused upon the trafficking violation. (See id. at A.R. 193-94.)

In that regard, the A.R. Officer first discounted Plaintiffs' challenge to the validity of the RIB Investigation Report, since "[i]t seem[ed] unlikely that the [O]wners would have initially offered a detailed reply [to the Charging Letter] that did not refute trafficking if there was a genuine belief . . . the investigation was in error." (Id. at A.R. 193.) Second, the A.R. Officer found Plaintiffs' no-photo argument unpersuasive because the Report "provide[d] the serial number from the recovered cash as required by agency policy" and there is "no policy to photograph

cash recovered in trafficking investigations." (Id.) Third, as to the time-card evidence presented on appeal and regarding a named female clerk to show that clerk was not scheduled to work at the time the Disputed Incident occurred, because the submitted typed weekly work schedule for that clerk had several written modifications, the A.R. Officer found it dubious, stating "it is possible the [named clerk] did work at the time that the trafficking occurred." (Id.) The A.R. Officer also underscored that the RIB Investigation Report did not "provide an identification of involved employees" but "state[d] descriptive information about clerks"; thus, it was possible the "[I]nvestigator was describing another female employee." (Id.) In sum, the time-card evidence was found to be unconvincing evidence that trafficking did not occur as charged. (See id.) Fourth, comparison of the Items Receipt and the Disputed Incident Receipt supported the conclusion that the RIB Investigation Report was credible and supported the trafficking charge since one "is an itemized list of eligible grocery items for $13.45" and the other "provides a generic description of 'GROCERY' . . . for an even dollar amount of $20.00." (Id. at A.R. 194.) Fifth, Plaintiffs' Sign-Off Sheets regarding employees reviewing the Guide and Video was "not evidence of [Plaintiffs'] written [SNAP] compliance policy" and "are not sufficient to establish that a SNAP compliance policy and program were in operation prior to the occurrence of

the violations."   The A.R. Officer explained that "[w]ithout a copy of the written curricula and contemporaneous records of SNAP training sessions[,] retailer Operations could not properly evaluate the training program" and Plaintiffs' evidence of Sign-Off Sheets "with no corroborating employment records", even with the sample employee SNAP test, was "not sufficient to determine that an effective personnel training program had been developed and instituted at the [Store}." (Id.)  Finally, to the extent Plaintiffs argued they had "no previously documented instance[s] of violations," that "d[id] not constitute valid grounds for dismissal" since "the regulations stipulate 'FNS shall disqualify a firm permanently if personnel of the firm have trafficked . . . .'"  At bottom, "[i]n their initial reply, the [O]wners did not dispute that the trafficking took place nor was evidence advanced to refute the charges." (Id.)

Hence, after considering all of Plaintiffs' evidence and their arguments (see id. at A.R. 191-193 (listing Plaintiffs' evidence and arguments)), the A.R. Officer concluded "[t]he preponderance of the evidence supports that program violations did occur at [the Store]" with the RIB Investigation Record being "specific and accurate with regard to the dates of the violations." (Id. at A.R. 194.)  Accordingly, she sustained the Store's disqualification as a SNAP retail food store. (See id. at A.R. 195.)

II.  <u>Relevant Procedural Background</u>

Plaintiffs commenced this action on March 6, 2019.  (<u>See</u> Compl., ECF No. 1.)  They seek a reversal of the A.R.D.'s January 28, 2019 Final Agency Decision upholding the permanent disqualification of the Store from SNAP.  (<u>See</u> <u>id.</u> ¶¶ 9, 35 (requesting <u>de novo</u> judicial review of the Store's permanent disqualification).)  They base their action upon their contention that:

> neither the Charg[ing] Letter (which instituted the action) nor the proceedings before the Administrative Review [Division], offered any evidence or allegation that this trafficking instance actually occurred – specifically, there has been no sufficient corroborating evidence of the alleged cash exchange.

(<u>Id.</u> ¶ 29; <u>see also</u> <u>id.</u> ¶¶ 31-33.)  While admitting a majority of Plaintiffs' allegations, of relevance, Defendant denies the Store is an approved SNAP retailer (<u>see</u> Answer, ECF No. 11, ¶ 19), as well as Plaintiffs' allegations the FNS did not have evidence that the trafficking, <u>i.e.</u>, the Disputed Incident, occurred.  (<u>See,</u> <u>e.g.</u>, <u>id.</u> ¶¶ 27, 29-33.)  Defendant also raised the affirmative defense that:

> [h]aving determined . . . Plaintiffs trafficked in SNAP benefits, the United States is required by 7 C.F.R. §278.6(e) either to disqualify Plaintiffs or to subject them to a civil money penalty ("CMP").  Since Plaintiffs never produced evidence to establish that they had a regulation-compliant training program and compliance policy in place prior to the

> violations of the Food Stamp Act committed by
> Plaintiffs, Defendant could not have granted
> them a CMP, and had no discretion to abuse in
> applying the sanction specified by regulation.

(Id., 4th Affirm. Def.)

This case has been protracted by multiple extension requests regarding: discovery deadline (see ECF Nos. 16, 18, 19, 20); Defendant's time to commence dispositive motion practice, i.e., file its Summary Judgment Motion (see ECF Nos. 22, 24, 31); Plaintiffs' time to file their Opposition (see ECF No. 34); and, the USDA's time to file its Reply (see ECF Nos. 38, 39). Ultimately, the Summary Judgment Motion was fully briefed on August 19, 2021.  Plaintiffs' have recently requested oral argument on the Summary Judgment Motion.  (See ECF No. 42.)  In light of this decision, the request for oral argument is DENIED.

DISCUSSION

I.   Applicable Law

   A.   The Rule 56 Standard Generally

The standard for deciding a Rule 56 summary judgment motion is well-established.  For convenience, the Court reiterates said standard:

> Pursuant to Rule 56(a), "[a] court shall
> grant summary judgment if the movant shows
> that there is no genuine dispute as to any
> material fact and the movant is entitled to
> judgment as a matter of law."  FED. R. CIV. P.
> 56(a).  "A fact is 'material' for these
> purposes when it might affect the outcome of
> the suit under the governing law."  Adamson v.

Page 25 of 45

Miller, 808 F. App'x 14, 16 (2d Cir. 2020). Additionally, "'[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997). Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.

On a motion for summary judgment the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). Further, while the court "may consider other materials in the record," it "need consider only the cited materials" in ruling on a summary judgment motion. FED. R. CIV. P. 56(c)(3); see also Pennington v. D'Ippolito, 855 F. App'x 779, 782 (2d Cir. 2021) ("[I]n ruling on a summary judgment motion the court need consider only the cited materials in the parties' submissions." (internal citations and alterations omitted)).

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)). When drawing inferences from evidence in the record in favor of the non-moving party, however, a

> court should not accord the non-moving party
> the benefit of "unreasonable inferences, or
> inferences at war with undisputed facts."
> Berk v. St. Vincent's Hosp. & Med. Ctr., 380
> F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting
> County of Suffolk v. Long Island Lighting Co.,
> 907 F.2d 1295, 1318 (2d Cir. 1990)).
>
> "Once the movant has 'demonstrat[ed] the
> absence of a genuine issue of material
> fact . . . the onus shifts to the party
> resisting summary judgment to present evidence
> sufficient to satisfy every element of the
> claim.'" Pennington, 855 F. App'x at 781
> (alteration in original) (quoting Holcomb v.
> Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)).
> To do this, "[t]he non-moving party is
> required to 'go beyond the pleadings' and
> 'designate specific facts showing that there
> is a genuine issue for trial.'" Id.

Lavender v. Verizon N.Y. Inc., No 17-CV-6687, 2023 WL 1863245, at
*8 (E.D.N.Y. Feb. 9, 2023); see also Butler v. County of Suffolk,
No. 11-CV-2602, 2023 WL 5096218, at *18-20 (E.D.N.Y. Aug. 8, 2023)
(similarly articulating summary judgment standard).

B.   Requirements of SNAP Vendors, Generally

The FNS administers SNAP. See SS Grocery, 340 F. Supp.
2d at 176. "Food stores authorized by FNS to accept SNAP benefits
must comply with federal statutes and regulations governing SNAP"
and if found to be in violation of same "face monetary penalties
or disqualification from SNAP." (Support Memo at 6 (citing 7
C.F.R. § 278.6(a)); see also SS Grocery, 340 F. Supp. 2d at 176.
Violations include allowing participants to use their SNAP EBT
cards for ineligible food items and "trafficking", i.e., the
"buying selling, stealing, or otherwise effecting an exchange of

SNAP benefits  . . . for cash or consideration other than eligible food." 7 C.F.R. §§ 278.2(a), 271.2; see also SS Grocery, 340 F. Supp. 2d at 176.  "A finding of trafficking may be based on 'on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system.'"  Nova Grocery, Inc. v. United States, No. 20-CV-2150, 2022 WL 2657119, at *3 (E.D.N.Y. July 8, 2022) (quoting 7 U.S.C. § 2021(a)(2)).

    C.   Penalties for Violating SNAP Statutes and Regulations

        In SS Grocery, Judge D'Arcy Hall succinctly articulated the penalties, and the process for determining same, to which SNAP firms and vendors are subject for violating relevant statutes and regulations; this Court adopts Judge D'Arcy Hall's discussion, which is restates herein:

> The default penalty for a retail store found to have engaged in trafficking is permanent disqualification from the SNAP program.  7 C.F.R. § 278.6(e)(1)(i). Alternatively, "FNS may impose a civil money penalty in lieu of a permanent disqualification for trafficking . . . if the firm timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent violations of the Program." 7 C.F.R. § 278.6(i).  That is, a retail store must, "at a minimum," submit substantial evidence,[8]

---

[8] "Substantial evidence" is understood to be evidence which is "more than a mere scintilla[]" of evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 587 U.S. 97, 102-03 (2019).

which demonstrates that the store meets the following criteria:

> Criterion 1. The firm shall have developed an effective compliance policy . . . ; and

> Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

> Criterion 3. The firm had developed and instituted an effective personnel training program . . . ; and

> Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm.

7 C.F.R. § 278.6(i) [(i.e., the "Four Criteria")].

Prior to assessing any penalty, a retail store suspected of trafficking is sent a charge letter, specifying "the violations or actions which FNS believes constitute a basis for disqualification or imposition of a civil money penalty." 7 C.F.R. § 278.6(b)(1). In response, a retail store "shall set forth a statement of evidence, information, or explanation concerning the specified violations or acts," id., and notify FNS whether it "desires FNS to consider the sanction of a civil money penalty in lieu of

> permanent disqualification," 7 C.F.R. §
> 278.6(b)(2)(i). A retail store that receives
> an unfavorable determination from the FNS
> regional office is permitted to file an appeal
> to the Administrative Review Division
> [("ARD")]. 7 C.F.R. § 279.1. The [ARD]'s
> determination shall be the final determination
> of FNS, subject to review only by a district
> court. 7 C.F.R.§ 279.1(b).

SS Grocery, 340 F. Supp. 2d at 176 (emphases added); see also Arias
v. United States, No. 13-CV-8542, 2014 WL 5004409, at *2 (S.D.N.Y.
Sept. 29, 2014) (in responding to charging letter, a vendor may
"request consideration of a civil monetary penalty ("CMP") in lieu
of disqualification" in which case "[t]he FNS IAB reviews the
documents and issues [a] determination" which is "final unless the
[vendor] requests review" during which review it "may provide
further information to support its position"). And, the Court
reiterates, of significance, "FNS can permanently disqualify a
store for a single trafficking violation." Arias, 2014 WL 5004409,
at *2 (citing 7 U.S.C. § 2021; 7 C.F.R. § 278.6(e)(1); emphasis
added); Bros. Grocery & Deli, 2021 WL 4443723, at *2, *6 (same).

"Judicial review of a decision by the FNS, disqualifying
a firm from participation in SNAP as the result of a trafficking
violation, is a 'two-step process.'" Muazeb v. United States, No.
17-CV-6754, 2019 WL 1613433, at *7 (S.D.N.Y., Mar. 28, 2019)
(quoting Al Amin Halal Meat & Fish Market Inc. v. United States,
No. 15-CV-276A, 2015 WL 12552019, at *9 (W.D.N.Y. Oct. 21, 2015)).

First:

> The Food and Nutrition Act provides for "a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue . . . ."[9] 7 U.S.C. § 2023(a)(15). The court "must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." Nadia Int'l Mkt. v. United States, 689 F. App'x 30, 33 (2d Cir. 2017) (quoting Ibrahim v. United States, 834 F.2d 52, 53-54 (2d Cir. 1987)); see also, e.g., Timsina v. United States, 835 F. App'x 633, 635 (2d Cir. 2020) (explaining that the court "reexamine[s] the agency's decision on a fresh record, rather than determining whether the administrative decision was supported by substantial evidence" (quoting Ibrahim, 834 F.2d at 53)).

---

[9]  The Roque Court explained:

> "[A] de novo trial does not mean de novo legal review." 1413 Ave. J Supermarket, Inc. v. United States, No. 15-CV-7307 (CBA), 2017 WL 11575688, at *5 (E.D.N.Y. Sept. 30, 2017). In a trial de novo, the record in the district court, not the record before the agency, is what counts. Ibrahim v. United States, 834 F.2d 52, 54 (2d Cir. 1987). Therefore, in reviewing liability, a court "must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." Nadia Int'l, 689 F. App'x at 33 (citation omitted).

Roque v. United States, No. 3:21-CV-0823, 2024 WL 2126733, at *4 (D. Conn. May 13, 2024).

Nova Grocery, 2022 WL 2657119, at *3; see also Roque, 2024 WL 2126733, at *3 (citing 7 U.S.C. § 2023(a)(15)).   As the party seeking judicial review of the Agency's disqualification decision, the plaintiff bears the burden of proof by the preponderance of the evidence.   See Roque, 2024 WL 2126733, at *4 (citing 7 U.S.C. § 2023(a)(16))); see also Nova Grocery, 2022 WL 2657119, at *3 (observing all courts of appeal having addressed the burden-of-proof issue under Section 2023 "have placed the burden of proof on the party challenging the USDA's finding of liability" (quoting Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 378 (1st Cir. 2018) (collecting cases))); but see Nadia Int'l, 689 F. App'x at 33 n.1 (noting: "Section 2023 does not clearly specify which party bears the burden of proof in the review of a disqualification action"; the Circuit Court has not yet ruled on this issue; and, other circuit courts "have ruled that the party challenging the agency action bears the burden of proof").   "To meet this burden, the plaintiff must demonstrate that 'each cited instance of trafficking' was invalid, as the FNS may permanently disqualify a participant even after just one instance of trafficking." Muazeb, 2019 WL 1613433, at *7 (quoting S.S. Grocery, 340 F. Supp. 3d at 180 (further citation omitted)).

"Second, if a court finds that a violation occurred, the court must determine whether the sanction imposed was 'arbitrary or capricious, i.e., whether it was unwarranted in law or without

justification in fact.'" <u>Loma Deli Grocery Corp. v. United States</u>, No. 20-CV-7236 2021 WL 4135216, at *6 (S.D.N.Y. Sept. 10, 2021) (cleaned up); <u>see also</u> <u>Nadia Int'l</u>, 689 F. App'x at 33 (holding that, when reviewing the sanction imposed by the Agency, a court assesses "whether the Secretary's action was arbitrary or capricious, <u>i.e.</u>, whether it was unwarranted in law or without justification in fact" (quotations and citation omitted)). Such a determination "is a matter of law appropriately determined on a motion for summary judgment." <u>Id.</u> (quoting <u>Guzman v. U.S. Dep't of Agric. Food & Nutrition Serv.</u>, 931 F. Supp. 2d 488, 494 (S.D.N.Y. 2013) (internal quotation marks and citation omitted)).

II. <u>Application</u>

As an initial matter, the Court observes the Supreme Court recently overruled the <u>Chevron</u> doctrine. <u>See</u> <u>Loper Bright Enterps. v. Raimondo</u>, No. 22-451, -- U.S. --, 144 S. Ct. 2244, 2024 WL 3208360, at *2 (June 28, 2024). In doing so, it explained: "[T]he APA specifies that courts, not agencies, will decide '<u>all</u> relevant questions of law' arising on review of agency action, 5 U.S.C. § 706 (emphasis added)—even those involving ambiguous laws. It prescribes no deferential standard for courts to employ in answering those legal questions, <u>despite mandating deferential judicial review of</u> agency policymaking and <u>factfinding</u>. <u>See</u> §§ 706(2)(A), (E)." <u>Id.</u> (emphasis added); <u>see also</u> <u>id.</u> at *3 ("<u>Chevron</u>'s presumption is misguided because agencies have no

special competence in resolving statutory ambiguities. Courts do.”).  Loper, however, does not change the calculus here, since the underlying issue is whether there was substantial evidence supporting the USDA’s decision, which rests upon its factfinding role.

A.  The USDA’s Finding of Trafficking is Supported[10]

“Plaintiffs have not presented evidence to raise a triable issue on the Agency’s finding of trafficking.”  Roque, 2024 WL 2126733, at *4.  It is well-established the FNS may disqualify a participating store based upon, inter alia, “on-site investigations”.  See 7 U.S.C. § 2021(a)(2); see also Nadia Int’l, 689 F. App’x at 33 (citing 7 U.S.C. § 2021(a)(2)); 21871 Hempstead Food Corp. v. United States, No. 14-CV-0006, 2014 WL 4402069, at *1 (E.D.N.Y. Sept. 4, 2014) (finding violation based on investigation of confidential informant “who visited the store four times and observed violations of SNAP regulations”).  That is the scenario here.

Based upon the undisputed evidence in this case, and “drawing all inferences in [the Store’s] favor, a reasonable factfinder could conclude only that the [A]gency’s trafficking determination was valid.”  Nadia Int’l, 689 F. App’x at 33-34;

---

[10]  Because Plaintiffs’ sale of ineligible food items was subsumed by the subject trafficking claim, the Court focused only upon the trafficking claim.  See, e.g., 21871 Hempstead, 2014 WL 4402069, at *1 n.3.

see also Roque, 2024 WL 2126733, at *5.  The Court finds "[t]he record shows 'compelling evidence of trafficking.'"  Roque, 2024 WL 2126733, at *5 (quoting Brothers Grocery, 2021 WL 4443723, at *10).  First, in their Charging Letter Response, the Owners did not dispute the trafficking allegation; instead, they asserted the clerk who engaged in the illegal "cash transaction" "ha[d] already been terminated for other misconduct . . . ."  (A.R. 76.)  Given their implied admission together with their contemporaneous explanation of the actions they took thereafter, the Court finds disingenuous the Owners' subsequent challenge to the trafficking claim based upon a purported dispute about the identity of the clerk in question.  Indeed, as Defendant aptly argues, there is no requirement to correctly identify the clerk who facilitated the Disputed Incident.  (See Reply at 7 n.3 (citing Four Winds Behav. Health v. United States, No. 19-CV-0212, 2021 WL 2821094, at *10 (D.N.M. July 7, 2021) ("[B]ecause the Act punishes violations committed by the store, the [FNS]'s failure to identify the clerks who improperly accepted the food stamps is irrelevant." (quoting Wolf v. United States, 662 F.2d 676, 678 (10th Cir. 1981)))).  In that vein, Defendant argues, to the extent Plaintiffs assert, "the Investigator's description of Clerk #2 from Exhibit E, who was alleged to have trafficked in SNAP benefits, differs from his statements in his deposition where he identified the clerk as a male rather than a female" (Pl. Add'l Facts ¶ 102 (citing

Investigator Dep. Tr. 51:6-22; comparing Ex. E (Investigator's Report of Disputed Incident))), when read in context, "[t]he transcript clearly shows that in his deposition[,] the . . . Investigator used the term 'Clerk 2' to refer to the male cashier who did not provide him with cash in exchange for SNAP benefits, who was identified in his written report as 'Clerk 1.'" (Def. Add'l Facts Resp. ¶ 102 (citing Investigator's Dep. Tr. at 45-53).) The Court agrees and, in any event, since the identity of the clerk is not significance under SNAP regulations, this is not a material issue. Additionally, Plaintiffs' submission of a work schedule and time card for one of the Store's clerks is, as Defendant contends, "dubious, at best" since it "contains several handwritten changes, including changes for May 16, 2018," the date of the Disputed Incident, and the clerk's timecard "indicate[s] that she worked outside her normal shift on more than one occasion, including on May 16, 2018." (Id. at 8-9.) There is no reason not to defer to the Agency's factfinding in its evaluation of this evidence; Plaintiffs simply disagree with the Agency's assessment of their evidence. Similarly, when the Court considers that Plaintiffs' submission of this evidence was not initially forthcoming, it finds, like the Agency found, the veracity of the work schedule and timecard evidence to be diminished, if not unpersuasive.

Conversely, in accordance with Agency policy, the Investigator recorded in his Investigation Report the serial number of the trafficked $20-bill involved in the Disputed Incident. This is corroborated by the Investigator's testimony, <u>i.e.,</u> as was his custom, after receiving the $20-bill, the Investigator wrote down the serial number for said bill. (<u>See</u> Investigator's Dep. Tr. at 53-56.) The lack of a photograph of that bill is of no moment: first, that is not required by Agency policy; and, second, it does not create a disputed issue of fact.

Further, comparison of the Items Receipt to the Disputed Incident Receipt is persuasive, substantial circumstantial evidence that trafficking occurred at the Store on May 16 at approximately 5:00 p.m. <u>See, e.g.,</u> <u>Nova Grocery</u>, 2022 WL 2657119, at *5 ("As the Second Circuit has 'emphasized time and again', including in this precise context, circumstantial evidence 'is of no lesser probative value than direct evidence.'" (quoting <u>Timsina</u>, 835 F. App'x at 637)); <u>see also</u> <u>Loma Deli Grocery Corp.</u> <u>v. United States</u>, No. 20-CV-7236, 2021 WL 4135216, at *8 (S.D.N.Y. Sept. 10, 2021) (instructing, in accordance with applicable statutes, "courts regularly grant summary judgment based on EBT transaction data" circumstantially establishing trafficking by participating SNAP vendors)(citing 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a); collecting cases). Indeed, the glaring difference between the two Receipts both underscores how different the two

Page 37 of 45

transactions were and highlights the illegal nature of the Disputed Incident, since the Items Receipt provided an itemized list of eligible grocery items purchased for the specific amount of $13.45, whereas the Disputed Incident Receipt simply stated a generic description of "GROCERY" for the even dollar amount of $20.00. Such a dichotomy between the two Receipts in such a minuscule timespan provides strong circumstantial evidence that the Disputed Incident was illegal trafficking. Finally, it condoning the Disputed Incident, the Owners stated the clerk who facilitated it was a Store employee. (See A.R. at 76 (explaining further that the clerk "invited" the Investigator back to her register and stated she would engage in the trafficking because she knew "a couple of tricks").) Their subsequent submission of additional evidence is incapable of backtracking this acknowledgement that the trafficking occurred. "Accordingly, in light of the abundant circumstantial evidence in the record, Plaintiffs have failed to raise a triable issue of fact on the Agency's determination that Plaintiffs engaged in trafficking." Roque, 2024 WL 2126733, at *5.

B.   The USDA's Sanction of Permanently Disqualifying Plaintiffs was not Arbitrary and Capricious

For convenience, the Court reiterates:

[t]he penalty for trafficking in SNAP benefits is permanent disqualification from the program unless a retailer qualifies for a civil money penalty [("CMP")]. 7 C.F.R. § 278.6(e)(1)(i).

> The Agency has discretion to impose a civil
> money penalty in lieu of permanent
> disqualification "if the Secretary determines
> that there is substantial evidence that [the]
> store or food concern had an effective policy
> and program in effect to prevent
> violations[.]" 7 U.S.C. § 2021(b)(3)(B).

Roque, 2024 WL 2126733, at *5 (emphasis added). Similarly, the
Court has articulated the Four Criteria (see supra at 29)), which
"must be established by substantial evidence" to qualify for a
CMP. Id. Because there is no dispute that Plaintiffs satisfy
Criterion Four, i.e., the Owners were unaware of trafficking
activity, the Court focuses its attention upon Criteria One through
Three.

    As a general observation: To the extent Plaintiffs
produced evidence regarding new procedures they have implemented
since receiving the Charging Letter, such evidence does nothing to
address the crucial issue, which is whether, prior to receiving
the Charging Letter, the Store had effective SNAP compliance
policies and programs in existence and operating. See generally
21871 Hempstead Food, 2014 WL 4402069 (where store submitted
supplemental response, which included signed and notarized
statements from store owner and store employees, but did not
include the required written and dated compliance policy, finding
no material dispute to preclude summary judgment as a matter of
law); Arias, 2014 WL 5004409, at *13 (rejecting offered evidence
that "d[id] not demonstrate the existence of a compliance policy

prior to the occurrence of the violations"). Since such evidence is irrelevant to the issue to be determined under Criteria One through Three, no matter the volume of same, it follows that it cannot be substantial.

As to Criterion One: Similar to the Arias case, where the court granted the USDA's summary judgment motion, here, "[P]laintiffs have failed to offer dated, documentary evidence of a compliance policy." Arias, 2014 WL 5004409, at *13 (stating further "[p]laintiffs also failed to submit any other dated training curricula or other firm policies that 'reflect a commitment to ensure that [the Store] [wa]s operated in a manner consistent with' the FSA" (quoting 7 C.F.R. § 278.6(i)(1))); see also 21871 Hempstead Food, 2014 WL 4402069, at *3 (finding plaintiff's evidence did not warrant imposition of monetary penalty where, inter alia, "[i]t did not submit a written and dated copy of its compliance policy, which the regulations require"). Instead, Plaintiffs submitted their Sign-Off Sheets, which required employees to sign a form indicating they had reviewed the Guide and Video before beginning working in the Store. (See A.R. 75, 79, 133-72.) Having reviewed the Sign-Off Sheets, the Court concurs with Defendant that "[s]uch forms, which neither set forth the requirements of SNAP retailers, nor expressly list prohibited acts, are not satisfactory." (Support Memo at 23.) Indeed, said Sign-Off Sheets fall short of demonstrating an effective

compliance policy, as required by the applicable regulation, 7 C.F.R. § 278.6(i)(1), which requires the Store's policy comprise of "written and dated statements". 7 C.F.R. § 278.6(i)(1); <u>see also</u> <u>21871 Hempstead Food</u>, 2014 WL 4402069, at *3 ("The regulations further set out the supporting documentation that the FNS requires and will consider. As to the existence of an effective compliance policy, 'FNS shall consider written and dated statements of firm policy.'"(quoting 7 C.F.R. § 278.6(i)(1))).

As to Criterion Two: "As to the existence of the policy before the violations occurred, 'policy statements shall be considered <u>only if</u> documentation is supplied which establishes that the policy statements were provided to the violating employee(s) prior to the commission of the violation.'" <u>21871 Hempstead Food</u>, 2014 WL 4402069, at * 3 (quoting 7 C.F.R. § 278.6(i)(1)) (emphasis added). Plaintiffs have failed to do so; instead, having reviewed the record, the Court agrees with Defendant that "the only 'policies' Plaintiffs provided were the ones they stated would be adopted in response to the Charg[ing] Letter." (Support Memo at 23 (citing A.R. 74-76).) Such a prospective offer fails to meet Criterion Two. And, to the extent Plaintiffs offer affidavits of the Owners and a Store clerk, they, too, are unavailing since they "neither contain policy statements nor set forth the requirements of the SNAP program as set forth in the regulations." <u>Arias</u>, 2014 WL 5004409, at *13; <u>see also</u> <u>Nova</u>

Grocery, 2022 WL 2657119, at *7 ("[A]lthough the declarations from
[the store's] co-owner and employee attested to the existence of
regular training, '[s]tore owners cannot simply attest to having
effective antifraud programs; rather, they must prove it.'"
(quoting Rosario v. United States, No. 3:14-CV-0907, 2017 WL
4316093, at *4 (D. Conn. Sept. 27, 2017); further citation
omitted)); Roque, 2024 WL 2126799, at *6 ("A single affidavit
purporting to prove that employees were trained falls short of the
exacting standards in the regulations requiring a party to
establish it qualified for a civil money penalty through
substantial evidence." (citing Rosario, 2017 WL 4316093, at *4)).

    Regarding the program component of Criterion Two,
Defendant contends:  "The only program purportedly in place at the
time of violation was [the Store's] alleged requirement that
employees sign a [Sign-Off Sheet], on or before the first day of
work, stating that they had reviewed the SNAP [Guide] and watched
the USDA's SNAP [Video]."  (Support Memo at 23 (citing A.R. 75,
79, 133-72).)  Yet, the Sign-Off Sheets do not "set forth the
requirements of the SNAP program as set forth in the regulations."
Arias, 2014 WL 5004409, at *13.  However, even assuming, arguendo,
the Store's having employees review the Guide, watch the Video,
and execute a Sign-Off Sheet indicating they had done both, could
be viewed as a SNAP-compliance program, that is not enough;
Criterion Two requires a firm establish both a compliance policy

and a compliance program. See 7 C.F.R. § 278.6(i); see also 7 U.S.C. § 2021(b)(3)(B) (stating FNS has "the discretion to impose a civil penalty . . . in lieu of disqualification . . . [if] there is substantial evidence that [the firm] had an effective policy and program in effect to prevent violations of the" FSA (emphasis added)); Arias, 2014 WL 5004409, at *13 (stating to be eligible for a CMP, a plaintiff must satisfy all Four Criteria). Since Plaintiffs have failed to proffer substantial evidence showing they had a compliance policy in operation before the Disputed Incident, Plaintiffs are unable to meet Criterion Two. Therefore, they cannot show they are eligible for a CMP.

As to Criterion Three: Regarding "the existence of an effective personnel training program, '[a] firm which seeks a [CMP] in lieu of a permanent disqualification shall document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s).'" 21871 Hempstead, 2014 WL 4402069, at *3 (quoting 7 C.F.R. § 278.6(i)(2)). Again, while Plaintiffs' Sign-Off Sheets may, arguendo, be enough to show "dates training sessions were conducted" that is not enough to satisfy Criterion Three. As Defendant accurately highlights:

> Plaintiffs did not provide dated training curricula or a record of dates of employment of firm personnel. The only documents purporting to show employee training were the [Sign-Off Sheets], which identify no training other than the alleged review of the SNAP [G]uide and viewing of the [V]ideo. Plaintiffs provided no evidence of follow-up training for employees after their respective hiring dates.

(Support Memo at 24 (citing A.R. 75, 79, 133-72).) Yet, that is what the SNAP regulations require. See 7 C.F.R. § 278.6(i)(2).

At bottom, "[b]ecause [P]laintiff[s] failed to submit substantial evidence in accordance with the regulations, the sanction of permanent disqualification was mandatory." Roque, 2024 WL 2126733, at *6 (quoting Rosario, 2017 WL 4316093, at *4 (collecting cases)); see also id. ("[T]he decision to permanently disqualify Plaintiffs from SNAP was not arbitrary and capricious because the Agency followed its regulations to determine whether the [P]lantiffs qualified for a civil money penalty in lieu of a permanent disqualification."); 21871 Hempstead Food, 2014 WL 4402069, at *3 (finding plaintiffs "ha[d] not provided the requisite 'substantial evidence' of its compliance policy and training program", therefore, the Agency "did not act arbitrarily or capriciously" in permanently disqualifying the store). "The permanent disqualification sanction may be harsh, but it is what the governing regulations required in this case." 21871 Hempstead Food, 2014 WL 4402069, at *3.

<u>CONCLUSION</u>

Accordingly, **IT IS HEREBY ORDERED** that the Summary Judgment Motion (ECF No. 33) is GRANTED; once Judgment has entered, the Clerk of Court is directed to CLOSE this case; and

**IT IS FURTHER ORDERED** that, in conjunction with granting summary judgment in Defendant's favor, Plaintiffs' letter motion requesting oral argument on Defendant's Motion (ECF No. 42) is DENIED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
JOANNA SEYBERT, U.S.D.J

Dated:      September 30, 2024
            Central Islip, New York